# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS
## EASTERN DIVISION

| | |
|---|---|
| [UNDER SEAL], | Case No. _____ |
| Plaintiff(s), | **COMPLAINT** |
| vs. | **JURY TRIAL DEMANDED** |
| [UNDER SEAL], | **FILED *IN CAMERA* & UNDER SEAL PURSUANT TO 31 U.S.C. § 3730** |
| Defendant(s). | **NOT FOR PUBLIC DISCLOSURE DO NOT PLACE IN PRESS BOX DO NOT ENTER ON PACER** |

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS
## EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* AMYE DARLING, CHERYL RANDALL, AND DOUG KENNEDY<br><br>Plaintiffs/Relators,<br><br>v.<br><br>VISITING NURSE ASSOCIATION OF CAPE COD, INC.,<br>Defendant. | Case No. _____<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>**FILED *IN CAMERA* & UNDER SEAL PURSUANT TO 31 U.S.C. § 3730**<br><br>**NOT FOR PUBLIC DISCLOSURE DO NOT PLACE IN PRESS BOX DO NOT ENTER ON PACER** |

### *QUI TAM* COMPLAINT

Relators Cheryl Randall, Amye Darling, and Doug Kennedy, on behalf of themselves and the United States of America, allege and claim against Defendant Visiting Nurse Association of Cape Cod, Inc. ("VNA") as follows:

### INTRODUCTION

1.      VNA is a not-for-profit organization established in 1916 in Cape Cod, Massachusetts. VNA offers home health and hospice services in an area spanning approximately 1,300 square miles. With over 850 employees, VNA claims to provide more than 300,000 home visits per year.

2.      VNA is part of Cape Cod Healthcare, which claims to be the "leading provider of healthcare services for residents and visitors of Cape Cod," with more than 450 physicians and 5,300 employees. According to Dun & Bradstreet, Cape Cod Healthcare recorded $931 million in revenue in 2020.

3.      Despite its stated goal of "assist[ing] patients in achieving their maximum independence and health status while remaining safely in their own home,"[1] VNA's reality was more sinister: it engaged in a pervasive, all-encompassing scheme of willfully flouting Medicare regulations in order to maximize its Medicare reimbursements, even when doing so was to the obvious detriment of its patients.

4.      VNA systematically defrauds Medicare by manipulating and falsifying patient assessment information, flouting federal Medicare regulations, and billing for ineligible patient visits and services. In addition, VNA cultivates and maintains a company-wide culture that prioritizes profit over patient needs and requires its employees to either participate in VNA's fraudulent schemes or face reprimand and even termination.

## JURISDICTION AND VENUE

5.      This action arises under the False Claims Act, 31 U.S.C. §§ 3729-33 (the "False Claims Act"). Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1331. Jurisdiction is also authorized under 31 U.S.C. § 3732(a).

6.      Venue lies in this judicial district pursuant to 31 U.S.C. § 3732(a) because Defendant qualifies to do business in the Commonwealth of Massachusetts, transacts substantial business in the Commonwealth of Massachusetts, transacts substantial business in this judicial district, and can be found here. Additionally, and as described herein, Defendant committed within this judicial district acts proscribed by 31 U.S.C. § 3729. Specifically, Defendant submitted and caused to be submitted within this judicial district false claims to Medicare for Home Health

---

[1] *Visiting Nurse Association of Cape Cod*, CAPE COD HEALTHCARE, https://www.capecodhealth.org/about/vna/.

services unnecessarily for ineligible patients and submitted or used false records material to such claims.

## PARTIES

### A.    Cheryl Randall

7.      Relator Cheryl Randall is a Registered Nurse who was employed by VNA in Cape Cod, Massachusetts from 2011 until August 2020.

8.      Randall has over thirty years of experience in the health care industry. She began her career as a Certified Nursing Assistant at a nursing home and then began work at a home health agency in the late 1980's and early 1990's.

9.      After a stint as an Emergency Medical Technician, Randall became a Licensed Practical Nurse in 1996. Following a decade of continued work in health care, Randall became a Registered Nurse in 2008.

10.     In 2011, Randall was hired by VNA in Cape Cod, Massachusetts. Randall remained an employee of VNA from 2011 until her discharge in 2020.

11.     During her nine years with VNA, Randall worked in a floating position in which she would cover for other employees in different positions as necessity required. For instance, Randall at one point covered for a Case Manager on maternity leave for two months. Relator Randall's floating position allowed her to see various sides of VNA and obtain a better understanding of VNA's inner machinations.

### B.    Amye Darling

12.     Relator Amye Darling is a Registered Nurse who began working for VNA in Cape Cod, Massachusetts in 2011.

13.     Darling has thirty-four years of experience in the health care industry. Beginning as a paramedic out of high school, Darling became a Licensed Practical Nurse in 1994 and a Registered Nurse in 1998. Relator Darling was originally hired by VNA as a floating nurse. Like Relator Randall, her duty was to see other nurses' patients when they were not able to. After just a year as a floating nurse, Darling became a Case Manager for VNA, where she remained for the duration of her time with VNA.

**C.     <u>Doug Kennedy</u>**

14.     Relator Doug Kennedy was a Physical Therapy Assistant ("PTA") employed by VNA and its parent company, Cape Cod Healthcare, in Cape Cod, Massachusetts for over twenty years.

15.     Relator Kennedy received his degree in 1995 and immediately began working as a Physical Therapy Assistant for Falmouth Hospital in Massachusetts. In or around 2010, Kennedy transferred to VNA.

16.     After two decades of employment, Kennedy left VNA and started Ergonomic Solutions of New England.

<u>**DISCLOSURE**</u>

17.     Prior to filing this Complaint, Relators voluntarily disclosed to the United States the information upon which this action is based. To the extent that any public disclosure has taken place as defined by 31 U.S.C. §3739(e)(4)(A), Relators are the original source of the information for purposes of that section.  Alternatively, Relators have knowledge that is independent of and materially adds to any purported publicly disclosed allegations or transactions, and Relators voluntarily provided that information to the Government before filing this Complaint. Relators are

serving contemporaneously herewith a statement of the material evidence in their possession upon which their claims are based.

## RELEVANT RULES AND REGULATIONS

### The United States False Claims Act

18.     The FCA provides, in pertinent part, that a person is liable to the United States who: knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay money to the government; knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay money or property to the government; or conspires to commit any of the above violations. 31 U.S.C. § 3729(a)(1).

19.     Liable parties must pay the government for a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461; Public Law 104-410), plus three times the amount of damages which the Government sustains. *Id*. § 3729(a)(1)(G).

20.     The term "claim" means any request or demand for money or property that: (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government provides or has provided any portion of the money or property requested or demanded; or will reimburse such contractor, grantee, or other recipient for any portion of the money that is requested or granted. *Id*. § § 3729(b)(2).

21.     The term "obligation" includes the retention of any overpayment. *Id*. § 3729 (b)(3).

22.     "Knowing" and "knowingly" "(A) mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud[.]" *Id.* § 3729(b)(1).

23.     The statute of limitations is 6 years after the date on which the violation of section 3729 is committed, or more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed, whichever occurs last.  *Id.* § 3731(b).

## MEDICARE AND HOME HEALTH

**A.     The Medicare Home Health Benefit: Background**

24.     Through the Medicare program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, et seq., the United States provides health insurance coverage for eligible citizens. The United States Department of Health and Human Services, specifically the Center for Medicare and Medicaid Services ("CMS"), oversees the administration of Medicare.

25.     Through the Medicare Home Health Benefit, Medicare pays for certain Home Health services for qualified individuals. *See* 42 U.S.C. § 1395d(a)(3).

26.     Home Health services provided by Medicare can include a relatively wide range of services, amounting to six different "disciplines": part-time or "intermittent" skilled nursing care, physical therapy, occupational therapy, speech-language pathology services, medical social services, and part-time or intermittent Home Health Aide services (personal hands-on care). *See* 42 C.F.R. § 409.44.

27.     Federal law imposes several criteria that must be met before CMS will approve home health benefits for a given patient. In short, the services provided must consist of skilled services, the patient must be confined to home, and the services must be reasonable and necessary and conform to the patient's "plan of care" ("POC").

28.     **Patients must be in need of skilled services to be eligible for the Home Health Benefit.** *See* 42 C.F.R. § 409.42(c). If the patient requires *only* unskilled care services, such as cooking, cleaning, and bathing, Medicare will **not** pay for Home Health benefits. *See* 42 C.F.R. §§ 409.33; 409.45(a).

29.     A service is not considered skilled for purposes of the Home Health Benefit if it could be safely and effectively performed by the average nonmedical person without the direct supervision of a nurse (or self-administered), even if a nurse actually provides the service or if no competent nonmedical person is available to provide it. *See* 42 C.F.R. § 409.44(b).

30.     **Likewise, the patient's confinement to the home is necessary for Medicare to pay for Home Health benefits.** *See* 42 C.F.R. § 409.42(a). If the patient is able to leave his home with relative ease and/or does so frequently, Medicare will not pay for Home Health benefits.[2]

31.     As with all Medicare programs, the services rendered by the HHA must also be reasonable and medically necessary for the treatment of the patient's illness or injury to be eligible for Medicare reimbursement. *See* 42 U.S.C. §1395y(a)(l)(A); 42 U.S.C. § 1396, *et seq.*; 42 C.F.R. §§ 409.44–45.

32.     Service that are performed at frequencies and durations not set forth in the patient's POC are not considered reasonable and necessary, and thus are not covered by Medicare. *See* 42 C.F.R. §§ 409.42(d); 409.43.

---

[2] CENTERS FOR MEDICARE AND MEDICAID SERVICES, MEDICARE HOME HEALTH BENEFIT, MEDICARE LEARNING NETWORK 3-4 (2019).

**B.      The Home Health Payment System – Prospective Payment**

33.      Instead of paying HHAs for Home Health services after they have been rendered, CMS provides a "Prospective Payment Amount" to the HHA based on the services that the HHA states that it *will* provide to a patient over a fixed period of days, known as "episode," based on the POC submitted by the HHA for that patient. *See* 42 C.F.R. § 484.205. Prior to 2020, the Prospective Payment covered a 60-day period / episode; after January 1, 2020, that period was shortened to 30 days. *Id.* Typically, the amount of the Medicare benefit paid to the HHA provider increases in direct proportion to the severity of the patient's condition as reported in the initial POC, the greater the amount of the reimbursement to the HHA.

34.      Thus, under the federal regulations existing at all times relevant to this Complaint, the CMS-approved procedure for coverage of home health benefits required a home health nurse to visit a patient, evaluate the patient's condition, submit a proposed POC for the "episode" – i.e., 60 or 30-day period at issue – and receive payment from Medicare.

**C.      OASIS / HHRG Scoring And Their Effect On HHA Reimbursement**

35.      An essential part of billing for the Home Health Benefit under current federal regulations is the Outcome Assessment and Information Set ("OASIS").

36.      OASIS is a collection of patient data that HHAs are required to gather at specific times for each payment episode. OASIS data is gathered by the HHA (1) when the patient is first "admitted" to the HHA – i.e., when the HHA representative first meets with and evaluates the patient and submits an initial POC, (2) when/if the patient is recertified for an additional episode of care, and (3) when care for the patient is concluded, whether by discharge from the HHA or due

to the patient's death.[3] Other events can also require reassessment of patient information, such as a transfer to an in-patient facility.[4]

37.     The entire collection of patient information from these standardized assessments makes up OASIS.

38.     CMS uses OASIS information to compare HHAs and ensure that patients receiving care from HHAs are actually in need of skilled services. However, OASIS is also an integral component of the billing process for HHAs, as it is used to determine payment under the Prospective Payment System.

39.     Using patient information gathered from OASIS, Home Health patients are assigned a Home Health Resource Group score ("HHRG"). The higher the HHRG score is for a given patient, the greater the Medicare reimbursement to the HHA for that patient will be.

40.     The HHRG score is based on information collected from the patient and placed in three subgroups: Clinical Deficit (C), Functional Status (F), and Service Utilization (S). An example HHRG might be C3F2S1.

41.     The (C) element, Clinical Deficit, is based on the existence and severity of certain chronic medical conditions. For example, diagnoses such as diabetes, congestive heart failure, end stage renal failure, or anything dealing with the major organ systems will result in higher (C) scores. However, if the extent of the patient's medical condition is merely asthma or constipation, the (C) score will be much lower.

42.     The Functional Status of the patient, or (F) in the HHRG rating, is determined by the patient's motor capabilities. A Home Health patient able to move around on their own will

---

[3] CENTERS FOR MEDICARE AND MEDICAID SERVICES, OUTCOME AND ASSESSMENT INFORMATION SET: OASIS-D GUIDANCE MANUAL 1–3–1–4 (2019), https://www.cms.gov/Medicare/Quality-Initiatives-Patient-Assessment-Instruments/HomeHealthQualityInits/Downloads/OASIS-D-Guidance-Manual-final.pdf.
[4] Id.

receive a low (F) rating, while a patient confined to the bed or in need of a wheelchair will receive a higher rating.

43.     The Service Utilization (S) component of HHRG is determined by the number of patient visits. A patient requiring fewer visits will receive a lower (S) score while a patient requiring more visits will receive a higher score.

44.     The higher a patient's (C), (F), and (S) scores is, the higher the HHRG will be. The higher the HHRG is, the greater the Medicare reimbursement to the HHA for that patient will be. The inverse is also true: a low HHRG score will result in a lower Medicare reimbursement. Diagnoses such as orthopedic injuries, neurological deficits, or diabetes would bring in relatively higher reimbursements than diagnoses like urinary tract infections, high blood pressure, or constipation.

45.     Thus, by assigning a patient higher Clinical (C), Functional (F), and Service Utilization (S) scores than needed, an HHA can receive unearned Medicare payments.

46.     Due to the critical role that it plays in both patient care and Medicare billing, the OASIS data that an HHA submits to CMS "must accurately reflect the patient's status at the time of assessment" in order for Medicare to pay for that patient's Home Health services. 42 C.F.R. § 484.45(b).

47.     To receive payment through Medicare, HHAs must complete a CMS-1450 Form, also known as a UB-04. This form contains various patient information, including the patient's HHRG.

48.     Each time it submitted a claim for Medicare reimbursement through the CMS-1450, VNA certified that the claim was true, correct, and complete, and complied with all Medicare laws and regulations. *See* CMS Form 1450.

### D.    Low Utilization Payment Adjustment

49.    CMS can downwardly adjust payments to an HHA retroactively based on an under-utilization of resources under the POC; this is known as a Low Utilization Payment Adjustment ("LUPA"). Prior to 2020, if an HHA did not provide at least 5 visits to a patient during the 60-day payment episode, its payment from Medicare would be adjusted downward. *See* 42 C.F.R. § 484.230(a). In other words, prior to 2020, HHAs received less money from Medicare for patients who had fewer than 5 visits during a given episode.

50.    Since January 1, 2020, HHAs have not necessarily needed to provide at least 5 visits to a patient during a payment episode to avoid a LUPA decrease in Medicare reimbursement, so long as they are "furnish[ing] minimal services to a patient during the 30-day period." *See* 42 C.F.R. § 484.230(b).

### E.    The Prototypical Medicare Home Health System

51.    HHAs operate by providing intermittent skilled care in the patient's home. If an HHA determines that a new patient is not in need of skilled care, or that an existing patient is no longer in need of skilled care, the HHA is not allowed to bill Medicare for services that it provides to that patient.

52.    An essential element of the Home Health Benefit is the patient's homebound status, so HHAs are required to only provide Home Health services to individuals who are actually confined to their homes. If an HHA realizes that a patient is able to leave their home with considerable ease, or do so on a frequent basis, the HHA is not allowed to bill Medicare for services that it provides to that patient.

53.    The relationship between HHA and patient typically begins when the patient is discharged from a hospital with orders to obtain home health care for a given amount of time.

Within 48 hours of referral, the HHA will send a Registered Nurse, such as Relators Randall and Darling, to the patient's home to perform an initial, standardized assessment of the patient (as required by 42 C.F.R. § 484.55(a)(1)). This assessment is intended to create a snapshot of the patient's overall health by scoring the patient's condition and functional mobility, the number of visits they will require, any diagnoses they have, and more.

54.     This is an important phase of the HHA-patient relationship, as it not only determines the patient's eligibility for Home Health care, but also how much and what type of care the patient will receive if found eligible. If the initial assessment shows that the patient is either not in need of skilled care or is not confined to the home, the HHA will not bill Medicare for any services provided to that patient.

55.     Based on the information from the initial assessment, the patient's certifying physician will work with the HHA to create a patient-specific POC. Among other things, the POC designates the discipline(s) assigned to the patient, whether it be nursing services, physical therapy services, speech-language pathology services, or occupational therapy services; the types of services to be provided within each discipline; and the amount and duration of visits that the patient requires.

56.     The initial assessment of the patient is also a vital part of the formula for determining the reimbursement that an HHA will receive from Medicare.

57.     Instead of paying HHAs for services already rendered, CMS pays the HHA a prospective amount based on how much the HHA will earn during an upcoming episode of days.

58.     By completing the initial patient assessments and sending them to CMS, an HHA is effectively telling CMS how many and what kind of services it will provide to a given patient over the next episode of days. Based on this assessment, CMS issues a payment to the HHA.

59.     Naturally, the more severe a patient's condition and the more services and visits the HHA will need to provide to the patient, the larger the Medicare payout will be for the HHA.

60.     Once the assessment is completed, the HHA will begin to provide care for the patient in accordance with the POC. This requires the HHA to provide services as specified in the POC at the times and durations that are laid out in the POC.

61.     At the end of a payment episode, the HHA and the certifying physician may feel that the patient requires an additional episode of home health care. In such a case, the patient would be recertified for additional care. Often, however, the patient will no longer require home health services for an additional episode, in which case the HHA would discharge the patient.

62.     Although the goal of the HHA is always to rehabilitate the patient to the point that re-hospitalization is unnecessary, if the health interests of the patient require it, in some instances re-hospitalization may be necessary.

63.     As with any service paid for by Medicare, HHAs must ensure that the services that they provide to their patients are reasonable and necessary in light of the patient's condition. This requires the HHA to seriously and accurately assess the nature and severity of the patient's condition, the patient's particular medical needs, and the accepted standards of medicine and nursing.

64.     Before 2020, HHAs were required to make at least five visits to a patient during each 60-day episode. If an HHA failed to make at least five visits, CMS would adjust the amount the HHA received for that episode. In other words, providing less than five visits could result in a decreased Medicare reimbursement for an HHA.

65.     After 2020, the 60-day episode was broken up into two 30-day episodes. If an HHA is able to fully treat the patient within the first 30-days, then the patient will be discharged and the

HHA will not receive any payment for the second 30-day episode. It is only when the patient still requires care that the HHA can continue providing services to the client during the second period and receive a second payment from Medicare.

66.     A properly managed HHA will always take into account the rights of the patient. *See* 42 C.F.R. § 484.50. Thus, an HHA must seek a patient's informed consent regarding, among other things, the care to be furnished, the disciplines that will furnish the care, and the frequency of visits. *Id.* Likewise, HHA's are supposed to abide by a patient's refusal to consent to any of the above. *Id.*

## VNA'S FRAUDULENT AND UNLAWFUL ACTIVITIES

67.     From at least 2011 to the present, VNA has defrauded the United States by submitting, or causing to be submitted, false or fraudulent claims to Medicare.

68.     VNA engages in an array of systematic, institutionalized schemes designed to maximize the amount of Medicare reimbursement it receives for each patient, whether it is legally permitted to do so or not, and with total disregard for the health and medical needs of the patient.

69.     From the moment it hires new health care providers – nurses or therapists – VNA trains them, manages them, and in some cases disciplines and threatens them, in an effort to maximize Medicare reimbursement.

70.     This system of training, pressure, and reward or discipline extends to nearly every facet of VNA's operations. VNA pressures its providers to use unnecessary and inaccurate diagnoses during the admission and readmission process to generate larger, unearned Medicare reimbursements, provides unnecessary services to ineligible patients for the sole purpose of maximizing profit, and bases patient care decisions on profitability – not the health or well-being of the patient.

71.     VNA has further defrauded the United States by its failure to report past overpayments and to reimburse Medicare for these overpayments.

**A.      VNA Manipulates Patient Assessments To Make Patients Appear Sicker And Maximize Medicare Reimbursements**

72.     VNA systematically defrauds Medicare by making patients appear sicker, or in greater need of medical care, than they actually are during the admission process.

73.     VNA uses unnecessary and inaccurate diagnoses during the admission and readmission process to make patients' medical conditions appear more severe than they actually are, generating inflated Medicare reimbursements in the process.

74.     VNA also uses secondary "reviews" of its nurses' initial patient assessments, both in-house and through the use of third-party auditing services, to inflate its nurses' patient assessments

75.     VNA's practice of manipulating patient assessments to achieve increased Medicare payments is done with minimal consideration of the medical needs or health interests of the patients.

**B.      Management Pressure To Render Unnecessary Services**

76.     Relator Cheryl Randall witnessed VNA's culture of Medicare abuse from her first days at VNA.

77.     During one of Relator Cheryl Randall's first patient assessments, her accurate reporting of the patient's condition and functionality resulted in a relatively low HHRG score, meaning that VNA's Medicare reimbursement would be smaller than usual.

78.     When Randall's team leader at the time, Pat Lawler Evans, reviewed Randall's assessment of the patient, she threatened to fire her. Evans berated Randall and made it clear to

her that – despite never seeing the patient – Evans believed that Randall's HHRG score for the patient was too low and told Randall that "she needed more training."

79.     Even though Randall had followed all the relevant procedures and guidelines and had assessed her patient accurately, Evans made it clear to Randall that her assessment resulted in an unacceptably low reimbursement for VNA, which meant that she would either need to "get with the program" or risk losing her job.

80.     Relator Randall realized she would have to adapt in order to survive at VNA. Not only did her supervisor at VNA expect her to exaggerate the severity of illness of -- and care needed by -- her patients on admission, but any attempt to score a patient according to their actual condition would be futile and put her job at risk.

81.     Despite Randall's best efforts to assess patients accurately, VNA's management made it clear to her and the other nurses that their assessments would be carefully scrutinized, that every patient's Clinical (C), Functional (F), and Service Utilization (S) ratings needed to be at least a 2 or a 3 – ensuring a high level of intervention and reimbursement. Any patient assessment score rated 0 or 1 would not only be changed on review, but the assessing nurse would likely be reprimanded.

82.     Relator Amye Darling similarly witnessed VNA's ingrained policies for submitting claims for unnecessary medical care at every step in the patient intake process. Darling and other VNA nurses were instructed that, as a matter of policy, they were not to deem a patient ineligible for home health services without management involvement. Instead, they were ordered to call a team leader, and invariably, that team leader would – through the use of creative wording of the patient's medical condition, or simply browbeating and intimidating the patient into accepting services – admit an ineligible patient into VNA's home health practice.

83.     Relator Doug Kennedy, a physical therapist assistant, also experienced VNA's scheme of assigning unnecessary services on a routine, near-daily basis.

84.     As a PT Assistant, Kennedy did not perform patient assessments. Rather, he provided PT services to patients who had already been assessed by a physical therapist.

85.     On a routine--at least weekly—basis, Kennedy would arrive at the home of a patient for whom PT had been ordered by VNA, only to find that the patient had no need for – or was utterly incapable of participating in – physical therapy.

86.     Relator Kennedy was an orthopedic rehab specialist, and enjoyed working with patients to increase their mobility and functionality, helping his patients return to their preferred daily activities. Kennedy estimates that at least 25% of the time, he found that PT had been ordered for elderly patients who could not participate at all in physical therapy exercises due to advanced age, dementia, or incapacity.

87.     Relator Kennedy reported the problem of PT visits being ordered for patients who could not possibly benefit from them to his supervisor, Lauren McCollum. In response, McCollum instructed Kennedy to just "go out and see" the patient anyway, and charge four billable units – an hour's worth of time, reimbursable by Medicare – for a home PT visit.

88.     This practice of ordering unnecessary PT at VNA was so common that Kennedy and his fellow PT Assistants developed a term for what they were reduced to performing: "Ankle Pumps and Eye Blinks." This meant that, for over 25% of their patients, PT Assistants at VNA were reduced to simply moving the patient's ankles up and down, and asking them to blink their eyes in response to stimulus.

C.      **Misleading Patient Assessments / Manipulating Primacy Of Diagnosis**

89.     Home health nurses often list multiple clinical diagnoses when completing the clinical portion of the patient assessment in OASIS. However, Medicare reimbursements for home health services are based on the first and second diagnoses assigned. Thus, any health conditions listed in the patient assessment beyond the first two conditions do not increase the HHRG score, and thereby do not affect the Medicare reimbursement paid to VNA for that patient.

90.     Relators Darling and Randall observed that VNA routinely instructed its nurses to ensure that, no matter what the patient's actual medical condition was, their primary and secondary conditions in the clinical portion of the patient assessment should be a high value condition: a neurological, orthopedic, or diabetes treatment. VNA nurses were instructed to use one of these three diagnoses in the clinical portion of the OASIS assessment if in any way possible, in order to increase Medicare reimbursements, even when doing so led to a misleading or false assessment of the patient's condition.

91.     For example, if a patient's primary need for receiving Home Health care was to treat a wound, but the patient also happened to have diabetes, Relators observed that VNA would commonly switch the diagnoses to make treatment of the diabetes the primary clinical concern, thereby increasing the Medicare payment for that patient.

92.     Similarly, Relator Darling recalls treating patients with histories of steroid-induced diabetes, a condition which does not need treatment when the patient is no longer on steroids. Despite this well-understood fact, VNA insisted that Darling and her fellow nurses list Diabetes as the primary clinical concern in a patient suffering from a urinary tract infection – even though the patient was not on steroids, did not need assistance with managing their diabetes, and their sole need for home health services was for treatment of the urinary tract infection.

93.     VNA's practice of using misleading diagnoses to inflate Medicare reimbursements was done regularly and with no regard for accuracy or the needs of the patient. Any diagnosis that could increase the potential Medicare reimbursement was highly prized by VNA. Thus, Relators frequently observed patients with well-managed diabetes and extremely minor, unrelated wounds – such as calluses or chapped skin – being coded by VNA as a diabetic with a related wound needing care, which was a high-value diagnosis. Relators both repeatedly saw treatments as simple as applying a Band-Aid billed by VNA as applying a "dry clean dressing to a wound" – a skilled nursing service.

94.     VNA's manipulation of reimbursements was literally encoded into the equipment it provided to its staff for patient assessments.

95.     VNA provided its staff with tablet or laptop computers for use in completing patient assessments in the patients' homes.

96.     In the last two years of Relator Randall's employment, VNA introduced new laptops. When Randall began using the newly-provided laptop, she observed that, when choosing among several possible diagnoses for a patient's condition, some questions – which, if answered "correctly" would lead to higher-value reimbursements – had dollar signs next to them ("$").

97.     Comparing her observations with her fellow nurses, Randall and her coworkers realized that VNA's new computer system had placed these dollar signs only next to questions that led to diagnoses which generated the highest Medicare reimbursements.

98.     The clear purpose of the $ sign was to signal to Randall and the other nurses that these were "important" questions leading to high-value diagnoses that should be added into the patient's assessment regardless of accuracy.

99.     Randall soon found that, if she did not assign a high-value diagnosis (from a question with a $ sign next to it) when completing a patient assessment, the person who reviewed her submission would almost inevitably go back and change the form so that at least one high-value diagnosis was added. Randall observed that this was typically done with absolutely no regard for accuracy or the best interests of the patients.

100.    In most cases, the reviewer would change Randall's original diagnoses to include high-value diagnoses, without even explaining to Randall what they changed or why.

101.    In other instances, reviewers would instruct Randall to add a diagnosis in an addendum to the patient's original assessment. Randall specifically recalls being told by her reviewers to change her notes to include that the patient is a fall risk in an addendum explaining that the fall-risk diagnosis was "overlooked at admission" – even though the patient was clearly not a fall risk. The sole purpose of this practice was to unnecessarily increase the patient's HHRG score to a level that would generate a higher payout from Medicare.

102.    Although the practice of attaching $ signs to profit-maximizing diagnoses only began in Relator Randall's last two years with VNA, the system of coercing employees into falsely recording patient information was in place since day one.

103.    One of Randall's first patients was an elderly man, Mr. S., living with and providing bathing, dressing, and personal care for his wife, who was in worse condition than Mr. S. and who did not have access to skilled nursing care. Although Mr. S. was technically the patient, he was the full-time caregiver for the wife. In fact, due to the husband's relatively good health and mobility, he was able to take his wife to the doctor regularly and do all the necessary shopping, cooking, and cleaning around the house.

104.    With these factors in mind, Randall completed the patient's initial assessment honestly and accurately. Because of Mr. S.'s relatively good health and strong functional mobility, Randall's assessment placed the husband in a low-reimbursement HHRG classification. In other words, Randall's assessment of the patient's condition, although accurate, would result in a relatively small Medicare reimbursement for VNA.

105.    Despite following all correct procedure and completing the assessment honestly, Randall was nearly fired when her team leader at the time, Pat Lawler Evans, reviewed the assessment. Evans berated Randall and informed her that she required further training.

### D.    Manipulation Of Patient Assessment Through Reviews

106.    VNA used a system of submitting its nurses' patient assessments to both internal and external reviews. VNA ostensibly used the review process to ensure quality and accuracy of patient assessments – but VNA's reviewers never actually saw the patients whose assessments they were reviewing, and often had no medical training (most had only a high school diploma). In fact, this system of reviews was essentially a thin smokescreen for finding ways to increase VNA's Medicare reimbursements.

107.    Randall and her fellow nurses routinely observed that VNA's process of "reviewing" its nurses' patient assessments almost invariably resulted in increasing the severity of their patient assessment, and thereby the charges to Medicare. In fact, Randall cannot remember a single instance when, after review, one of her patient assessments was revised such it would generate a lower Medicare reimbursement. At one point during Relator Randall's employment, VNA outsourced its review process to a company called QIRT (now doing business as McBee). Becky Cortis, an employee of QIRT, served as a point of contact between QIRT and VNA.

108.    QIRT's official role was to review the nurses' initial patient assessments and make changes where necessary to ensure accuracy and quality.

109.    After assessing a patient, Randall and the other nurses would receive a communication from a QIRT reviewer via an internet platform, internally called a "Dot Com" by VNA's nurses.

110.    QIRT reviewers, who often had no medical training and were only required to have a high school diploma, consistently changed VNA nurses' initial patient scores to make patients appear in worse health and in need of more care than they actually were.

111.    Unlike Relators and their fellow nurses, QIRT reviewers never saw the patients, often had little to no hands-on medical training, and were completely divorced from the actual assessment process. Yet the QIRT reviewers would consistently change VNA nurses' patient assessments, increasing patient scores from nurses' initial assessments to make patient conditions appear more severe.

112.    Moreover, changes made by the QIRT reviewers were often not even tangentially related to the needs of the patients. In only some rare cases would the QIRT reviewer or VNA management even tell the nurse why a patient's score was being increased.

113.    In Randall and Darling's experience, almost every change that QIRT reviewers made to patient scores had absolutely no basis in the patient's record; i.e., there was nothing in the information available to the reviewer that Randall or Darling had not already seen, yet the reviewer – without the benefit of seeing patients in person – overrode their findings to recommend more medical intervention. The reviewers' changes appeared to be unrelated to any medical information and part of a deliberate system in which patient assessments were manipulated to generate inflated and unearned Medicare payments.

114.     In their combined nearly twenty years with VNA, Relators Randall and Darling cannot recall a single instance of a reviewer recommending a change *decreasing* a patient's HHRG score, but received an increased change in score on nearly every assessment reviewed by QIRT or VNA's internal review team.

115.     VNA cut ties with QIRT in approximately 2018 or 2019. Today, VNA conducts all reviewing in-house. Despite the change, the practice of altering initial patient scores to justify greater Medicare reimbursements continued. Regardless of whether the reviews of nurses' patient assessments were completed in-house or by QIRT, the upwards changes to patient scores were near-constant, unrelated to medical necessity, consistently oriented towards higher Medicare reimbursement, and made with no consideration of the needs of the patient.

116.     Relators Randall, Darling, and the other nurses at VNA were forced to go along with changes made by reviewers for fear of losing their jobs. Randall and Darling knew they faced reprimand and possible disciplinary action from VNA management if they pushed back against the reviewers' "recommendations" on their patient assessments.

### E.     False Claims Or Exaggerated Assessments Based On Past Medical History

117.     Another standard practice that Relators observed VNA using to create greater Medicare payouts was to rely on past medical diagnoses to inflate the severity of new patient assessments.

118.     When a new VNA patient was referred from a hospital or nursing home, VNA commonly would selectively review the patients' past medical histories to find key past diagnoses that may justify costly future medical care.

119.   VNA would use those diagnoses to justify higher levels of medical intervention than necessary – and thus higher reimbursements from Medicare – even if the diagnosis in no way reflected the patient's current condition.

120.   For instance, VNA commonly claimed that its patients needed home health diabetes treatments, even if the patient had a history of Type 2 diabetes that was well-controlled, or had childhood diabetes but was well-rehearsed in insulin administration, blood glucose monitoring, and regularly consulting with a doctor. Regardless of its patients' present need for diabetes treatments, VNA would still rely upon a patient's past diagnoses to justify a higher payment.

### F.   Patient Pressure / LUPA Avoidance

121.   At one point during Relators' tenure at VNA, VNA instituted a policy implementing a "High-risk POC" if a patient's assessment indicated a high risk of hospitalization.

122.   VNA's high-risk POC would assign to the patient *every* Home Health discipline it provided regardless of the patient's actual needs. VNA referred to this as giving the patient the "full bucket." The purpose of assigning the "full bucket" was to ensure that VNA could achieve the minimum number of home health visits within a single Medicare "episode" before VNA lost the patient to a re-hospitalization, death, relocation, etc.

123.   Thus, VNA would automatically assign to that patient a registered nurse, a physical therapist, an occupational therapist, a home health aide, and even a speech therapist and social worker – with no regard for whether the patient assessment indicated any need whatsoever for this host of services.

124.   Patients often complained to both Relators Darling, Randall, and VNA management, protesting the imposition of unnecessary appointments with a speech or physical therapists.

125.   To combat this, VNA often instructed its healthcare providers (nurses and therapists) to tell patients that their physicians would be disappointed or angry with them if they did not utilize all the scheduled services. Relator Randall recalls instances of VNA even pressuring patients to sign a form acknowledging the disciplines which had been assigned to them following the initial assessment, with the intent of discouraging them from refusing any of those services – even if the patient knew they were clearly unnecessary.

126.   The sole purpose of VNA's high-risk POC was to increase its Medicare payment and avoid a Low Utilization Payment Adjustment (LUPA) by Medicare, and it routinely and systematically ordered its nurses, including Relators, to submit claims for the "whole bucket" of services when they were clearly unnecessary.

127.   Not only were the services provided to patients under the "high-risk POC" often not medically reasonable or necessary, but they were most often not even assigned by the patient's certifying physician. Despite this, VNA nurses were instructed by management to always assign the whole bucket of services, and if necessary, to call the patients' physician and invent reasons justifying the imposition of those services.

128.   Amanda Porter and other VNA team leaders, explicitly instructed Relators Randall and Darling and the other nurses to use the "whole bucket" of services when patients were at a high-risk of hospitalization.

129.   Compounding the effect of this clear abuse of the Medicare home health benefit was the fact that many of the patients deemed to be at "high risk" of hospitalization were given that designation based on VNA's practice of making patients appear in worse health than they actually were. As a result, many VNA patients received unnecessary care based entirely on VNA's practice of manipulating patient assessments to include inaccurate and misleading information.

130.    At some point during Relators' tenure at VNA, VNA management became cognizant of the danger that CMS may be aware of egregious examples of VNA's abuse of unnecessary referrals designed to avoid a LUPA. Thus, VNA began instructing nurses, including Relators, to continue assigning the "whole bucket" of services whenever possible.

131.    With patients who were receiving only nursing care visits, VNA knew that it would risk a LUPA if the nurse did not achieve at least five visits during the episode. But VNA knew that if *all* of VNA's nursing-only patients received exactly five visits, CMS would become suspicious. Thus, VNA instructed its nurses to ensure that they made more than five visits to nursing-only patients, but never more than eight visits if possible – because VNA had no financial incentive to continue to make nursing visits to patients once the risk of a LUPA – or CMS scrutiny – had been avoided. The patient's healthcare needs were at best a secondary concern in evaluating whether additional visits would be made.

### G.    "OASIS Speak"

132.    VNA's culture and practice of manipulating patient assessments to maximize reimbursement was so pervasive that VNA management literally developed a term to describe it: "OASIS Speak." Simply put, the home health nurses at VNA were trained that, no matter what the patient's medical condition required, they had to find a way to view the patients' medical conditions in the worst possible light, with a view towards the maximum number of skilled nursing or therapeutic interventions for the patient, so they had to "learn" how to write their patient assessments with this in mind. Relators Randall and Darling and their fellow nurses had another term for this indoctrination: OASIS Lies.

133.    A common example of "OASIS Speak" occurred in the context of determining a patient's mobility score. If Relator Randall or her fellow home health nurses wrote that a patient

was "independent with walking" – meaning that the patient could walk without assistance – management instructed them that they should ask whether walking with assistance would not be "safer" for the patient, and suggest a higher HHRG score – and therefore a higher Medicare reimbursement. In "OASIS Speak," a patient with an HHRG mobility score of 0 or 1 would *always* be viewed by VNA's reviewers as a 2 or 3, and Randall knew with certainty that if she scored a patient as 0 or 1, that assessment would be rejected and sent back to her.

134.    Healthcare providers at VNA were consistently pressured to request more interventions, and thus learned to think in "OASIS Speak" when completing evaluations. Any attempts to push back and argue that such a diagnosis would be unnecessary given the patient's condition would not only be rejected, but would also invite retaliation and threats of discipline from management.

135.    Relator Kennedy complained to his supervisors about the constant pressure to modify his notes on patients to increase Medicare reimbursement, noting that he was trained in orthopedic rehabilitation – not "Creative writing."

### H.    VNA Knowingly Bills Medicare For Ineligible Home Health Patients

136.    In addition to using inaccurate and unnecessary patient diagnoses in the admission and readmission process, VNA also systematically ordered and provided home health services for patients who were ineligible for the Home Health Benefit.

137.    VNA knew that many of its patients did not need skilled nursing care, or were not homebound, yet its management consistently directed nurses such as Relators Randall and Darling to provide services to such patients.

138.    **Patient R.M**. This patient, attended to regularly by Relators Randall and Darling, had impaired vision but was able to function independently, and VNA's nurses even observed him

driving himself frequently. The primary medical service that VNA was able to provide for him was to assist in monitoring and controlling his diabetes.

139.     Despite having no apparent need for skilled medical care, VNA charged Medicare for daily visits – seven days a week – for patient R.M.  Relator Randall would visit R.M. for the sole purpose of checking his blood sugar and administering insulin.

140.     R.M. was not in need of skilled nursing care: many diabetes products are specifically designed for use by patients with impaired vision like R.M.'s. Even with his low vision, R.M. could have easily checked his blood sugar with a simple-to-use, fully audible glucometer, and could have administered insulin with one of the readily available insulin pens designed for people with impaired vision.

141.     In sum, R.M. was simply not in need of skilled nursing services because the only services provided to him were ones that he could have safely and effectively self-administered.

142.     Not only did R.M. not meet the 'need for skilled nursing' home health benefit criteria, he was also not confined to his home. VNA nurses frequently saw R.M. driving himself around town in the area. Thus, R.M. was not eligible for the Home Health Benefit both due to his lack of need for skilled services, and his lack of confinement to the home.

143.     Randall brought up her observations of R.M. several times with her case manager at the time, Diane Holmes, and her team leader, Jeanette McGinley. Despite clear evidence that R.M. was neither in need of skilled nursing services nor confined to the home, VNA continued to provide services to, and bill Medicare for, R.M.

144.     **Patient M.R.** VNA management knowingly billed Medicare for home health services for another patient attended to by Relators Randall and Darling, who also failed to meet the criteria for the Medicare home health benefit.

145.     Patient M.R. required a daily abdominal injection of Lovenox. The patient could not self-administer due to a fear of needles, yet lived in the same building with a retired nurse who often administered the injection to M.R.

146.     When Relator Randall or Darling would arrive at Patient M.R.'s home, the patient would be fully dressed and making plans to leave the house for the day. When Relators would finish administering the patient's injection, the patient would often leave to go to lunch or to go shopping.

147.     There was no conceivable argument that M.R. was confined to her home or was in need of skilled nursing services. Relators Randall and Darling both told their superiors at VNA that M.R. was clearly ineligible for the home health benefit – yet VNA again insisted that they continue to provide services to M.R. for which VNA could bill Medicare.

## I.     VNA Endangers Its Patients By Prioritizing Maximum Medicare Reimbursement Ahead of Patient Health.

148.     In addition to systematically defrauding Medicare by ordering medically unnecessary and ineligible visits to avoid decreases in its Medicare reimbursement, VNA simultaneously failed to provide medically necessary patient visits when it lost the Medicare incentive to do so.

149.     One of VNA's tools for avoiding LUPA was its high-risk POC for patients at a high risk of hospitalization. As described above, VNA requires its nurses to assign the "whole bucket" of home health disciplines to patients that are deemed to be at high risk of hospitalization. Yet VNA's assessment tool for re-hospitalization risk was so sensitive that it deemed virtually all of VNA's patients to be at high risk. As a test, Relator Darling applied the tool to herself and found that VNA would classify her at a high-risk of hospitalization – even though she worked at a kickboxing gym for an hour every day.

150.     Prior to 2020, after patients received five visits from VNA during a given episode, the threat of a LUPA was eliminated. At that point, VNA would not lose any of its Medicare payout, but it also would not receive any increase in payment for providing additional visits during that episode.

151.     As a result, VNA told nurses that, once a patient received five visits during an episode, they were to strongly discouraged from providing additional services to the patient during that episode.

152.     This "five-and-done" system of patient visits was crafted to optimize patient profitability, even if it meant that patients would either receive unnecessary and ineligible care or would not receive immediately necessary care.

153.     On one occasion in or around 2017, Relator Randall received an email from VNA management reprimanding her because she had scheduled an additional skilled nursing visit for a patient who had already received five visits in a given episode. Randall realized that the patient needed additional services beyond the five essential visits. The management email VNA sent to Randall complained that her schedule had "created additional work" for VNA, even though the patient was, in Randall's professional judgment, clearly in need of the additional nursing services.

154.     In addition to disregarding patient needs in the determination of the ***number*** of visits, VNA also abused its patients' best interest by improperly limiting the ***length*** of those visits, so it could stretch its nursing staff to achieve more visits in one day.

155.     In or around 2017, either the Joint Commission or another reviewing agency audited VNA's practices and cited VNA for performing inadequately short patient visits.

156.    In response, VNA brazenly instructed its nursing staff to enter inaccurate reporting about the length of patient visits. VNA implemented a new policy requiring all nursing visits to be at least 30 minutes – but this rule was purely superficial.

157.    VNA tasked an entire team of nurses to review past records and find visits of less than 30 minutes. VNA's management then sent out a flurry of emails to the nurses responsible for those sub 30-minute visits, and instructed them to go back and alter records to make it appear as if the visit was in fact 30 minutes. In other words, VNA instructed its nurses to outright lie and falsify patient records.

158.    Because she maintained accurate records of her time spent assisting patients, and because some of her patients only needed care which would last 12 to 15 minutes per visit at most, Relator Randall had not met the 30-minute visit threshold on many occasions.

159.    When told to falsify her own records, Randall was naturally uncomfortable and took her uneasiness up with her team leader, Jeanette McGinley. Randall asked McGinley why it was necessary for her to go back and change the times that she had been in a patient's house. Randall informed McGinley that she always maintained accurate records, so for her to acquiesce to VNA's instructions would be to lie about the time that she had spent with patients.

160.    In response to Randall's challenge, McGinley attempted to justify VNA's instructions by explaining that Randall probably did more work in the home than she realized, suggesting that Randall may have completed her case notes in her car after the visit, or had completed some other patient-focused work after leaving the patient's home.

161.    Despite Randall's insistence that this was not how she performed her visits, and that any alterations to her visit records would be inaccurate and amount to a lie, VNA refused to change its position and continued to pressure nurses into retroactively falsifying their records.

**J.      VNA's Corporate Strategy And Culture Are Designed To Incentivize And Pressure Nurses And Other Employees To Maintain Fraudulent Records And Prioritize Company Profits Over Patient Well-Being**

162.     Though many of VNA's employees – like Relators Randall and Darling – have pushed back against what they saw as clearly unlawful practices that harmed their patients' health, VNA's aggressive corporate culture coerced compliance with its fraudulent schemes by threatening disciplinary action and termination to anyone unwilling to participate.

163.     The following are examples of the pressure that VNA exerted on its nurses and employees to falsify records and act contrary to the interests of patients:

164.     VNA's focus on Medicare reimbursement scheme were made patently clear to the nursing staff at monthly team meetings. These meetings included all nurses and were led by VNA team leader Jeanette McGinley. Other team leaders at VNA including Vicki Klein, Jean Callahan, Kate Brand, and Stephanie Eliopolous (exact spelling unknown) all repeated the essential points of VNA's schemes to increase Medicare reimbursement at every opportunity.

165.     Except for rare meetings where a presenter would teach about something related to patient-care, the focus of nearly every team meeting was on billing and reimbursement. Specifically, McGinley and other VNA managers spent those meetings hammering home the essential points of how to assess, document, and visit patients in order to maximize Medicare reimbursement.

166.     Many of these monthly meetings focused primarily on new Medicare regulations. However, VNA did not simply instruct compliance with the new regulations. Rather, McGinley and other team leads instructed VNA's nurses on techniques to stay ahead of and game the Medicare reimbursement system in order to maximize profits.

167.    In 2016, VNA hired Susan Donovan as a consultant. Donovan's primary role was to develop strategies to further maximize VNA's profits. Although the practice of prioritizing profits over patient needs was by that point fully ingrained into VNA's corporate culture, Donovan's sole purpose was to increase pressure on nurses to further VNA's practices of maximizing Medicare billing and reimbursement.

168.    Donovan used intimidation techniques and bullying to force nurse compliance with VNA's fraud. Donovan instituted the rule that "high-risk" patients be assigned the "whole bucket" of Home Health disciplines, regardless of patient needs or the instructions of the certifying physician.

169.    Donovan's stated goals to the VNA medical staff were to maximize profits and place VNA in the top 500 HHAs in the United States by revenue, even if doing so meant falsifying patient information or rendering unnecessary services.

170.    Perhaps the most egregious form of pressure exerted by VNA was in discouraging nurses from hospitalizing patients. Having its home health patients be re-admitted to the hospital would hurt VNA's ratings on annual audits submitted to CMS. According to Jeanette McGinley, VNA got "dinged" every time a patient was re-hospitalized.

171.    As a result, VNA actively discouraged nurses from sending patients to the hospital, regardless of the patient's best interests. Relators understood that under no circumstances were they ever to have a patient get re-admitted to a hospital. Relator Darling was threatened and then formally disciplined with a write-up for having too many patients hospitalized, even though she only ordered hospitalization as a measure of absolute last resort driven by the patient's urgent medical needs – knowing that such orders would, and did, invite discipline from VNA management.

172.    This particular practice of punishing nurses for ordering essential medical care for patients became a breaking point for Relator Randall. She had a heated argument with McGinley in which she explained that if a patient was in need of hospitalization, Randall would do what was best for the patient, not VNA.

173.    McGinley refused to alter her stance or address Randall's concerns, and VNA continued to actively discourage the hospitalization of patients, and threaten Randall with retaliation, including negative performance reviews or even termination, if she continued to refuse to comply.

174.    After discharge, patients were supposed to be given satisfaction of care surveys. However, VNA manipulated this process to ensure only positive reviews. For instance, VNA instructed nurses to let management know about any patients who were dissatisfied with care so that they would not receive a post-care satisfaction survey. In addition, if nurses saw a survey in the patient's home, they were told to "help" the patient fill it out and encourage them to give VNA the highest ratings.

## COUNT ONE
## PRESENTING OR CAUSING TO BE PRESENTED FALSE CLAIMS UNDER 31 U.S.C. § 3729

175.    Relators adopt and incorporate the previous paragraphs as though fully set forth herein.

176.    By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – presented or caused to be presented false or fraudulent claims to the United States for payment or approval, as follows:

a)     Defendant submitted false claims for Home Health care provided to patients whom Defendant knew did not meet Medicare or Medicaid requirements for Home Health, in violation of 42 U.S.C. §1395y;

i.     Defendant submitted false claims for Home Health care provided to patients who were not confined to the home as required by 42 C.F.R. § 409.42(a).

ii.     Defendant submitted false claims for Home Health care provided to patients who were not in need of skilled services as required by 42 C.F.R. § 409.42(c).

b)     Defendant submitted false claims for Home Health care by recording and transmitting inaccurate OASIS patient data, in violation of 42 C.F.R. § 484.45.

c)     Defendant submitted false claims for Home Health care that was not medically reasonable and necessary, in violation of 42 U.S.C. §1395y(a)(l)(A); 42 U.S.C. § 1396, *et seq.*; 42 C.F.R. §§ 409.44–45.

d)     Defendant submitted false claims for Home Health services premised upon Defendant's fraudulent certifications of compliance with Medicare regulations as made on CMS Forms 885A and 1450 and elsewhere.

177.   The United States paid the false claims described herein and summarized in paragraph 176(a)-(d).

178.   Defendant's fraudulent actions, as described *supra*, are part of a widespread, systematic pattern and practice of knowingly submitting or causing to be submitted false claims to the United States through fraudulent certification and re-certification of Home Health patients and fraudulent billing of the United States through Medicare or Medicaid.

179.    Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant and others by the United States through Medicare and Medicaid for such false or fraudulent claims.

WHEREFORE, Relators demand judgment in their favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relators may be entitled.

## COUNT TWO
## MAKING OR USING FALSE STATEMENTS OR RECORDS MATERIAL TO A FALSE CLAIM UNDER 31 U.S.C. § 3729

180.    Relators adopt and incorporate the factual allegations contained in the previous paragraphs as though fully set forth herein.

181.    By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim or to get a false or fraudulent claim paid or approved by the United States as follows:

a)    Defendant created and used false and inaccurate diagnoses; false patient charts designed to make patients appear sicker than they were in fact; and other false records intended to support its fraudulent billing to the United States, all in violation of 42 U.S.C. §1395y and the Medicare regulations cited *supra*.

b)    Defendant made false certifications regarding past, present, or future compliance with a prerequisite for payment or reimbursement by the United States through Medicare or Medicaid, including false certifications on CMS Forms 885A and 1450 as described *supra*, when

Defendant was aware that its practices as described herein were in violation of Medicare payment prerequisites, including but not limited to 42 U.S.C. §1395y.

182.    The false records or statements described herein were material to the false claims submitted, or caused to be submitted, by Defendant to the United States.

183.    In reliance upon Defendant's false statements and records, the United States paid false claims that it would not have paid if not for those false statements and records.

184.    Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant and others by the United States for such false or fraudulent claims.

WHEREFORE, Relators demand judgment in their favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relators may be entitled.

**COUNT THREE**
**"REVERSE FALSE CLAIMS" UNDER 31 U.S.C. § 3729(a)(1)(G)**

185.    Relators adopt and incorporate the factual allegations contained in the previous paragraphs as though fully set forth herein.

186.    By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the United States, or knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money or property to the United States:

a)      Defendant knew that it had received Home Health Medicare payments for patients who did not qualify for the Home Health Benefit, yet Defendant took no action to satisfy its obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States.

b)      Defendant knew that it had received inflated Home Health Medicare payments based on inaccurate and falsified patient assessment information, yet Defendant took no action to satisfy its obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States.

c)      Defendant knew that it had avoided Low Utilization Payment Adjustments (LUPA) to its Medicare reimbursement by providing unnecessary and unreasonable patient visits, yet Defendant took no action to satisfy its obligations to the United States to repay or refund the amount owed and instead continued to fraudulently use unnecessary and unreasonable patient visits to avoid LUPA.

187.    As a result of Defendant's fraudulent conduct, the United States has suffered damage in the amount of funds that belong to the United States but are improperly retained by Defendant.

WHEREFORE, Relators demand judgment in their favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relators may be entitled.

## COUNT FOUR
## CONSPIRACY UNDER 31 U.S.C. § 3729(a)(3)

188.    Relators adopt and incorporate the factual allegations contained in the previous paragraphs as though fully set forth herein.

189.    Defendant knowingly presented, or caused to be presented, false or fraudulent claims to the United States for payment or approval as follows: Defendant knowingly certified and/or re-certified Home Health patients whom it knew did not qualify for Medicare or Medicaid reimbursement, knowingly created and used unnecessary and inaccurate diagnoses at the patient admission stage, knowingly altered patient assessment information to include inaccurate and false information, knowingly used unnecessary and unreasonable visits to avoid deductions in payment, and presented or caused to be presented false claims to the United States through Medicare or Medicaid for payment of same.

190.    The United States paid Defendant for such false claims.

191.    Defendant, in concert with its principals, agents, employees, subsidiaries, and other institutions did agree to submit such false claims to the United States.

192.    Defendant and its principals, agents, and employees acted, by and through the conduct described *supra*, with the intent to defraud the United States by submitting false claims for payment to the United States through Medicare or Medicaid.

193.    Defendant's fraudulent actions, together with the fraudulent actions of its principals, agents and employees, have resulted in damage to the United States equal to the amount paid by the United States to Defendant and others as a result of Defendant's fraudulent claims.

WHEREFORE, Relators demand judgment in their favor on behalf of the United States and against Defendant, in an amount equal to treble the damages sustained by reason of

Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys'

fees, costs, interest, and such other, different, or further relief to which Relators may be entitled.

UNITED STATES OF AMERICA, *ex rel.*
AMYE DARLING, CHERYL
RANDALL, AND DOUG KENNEDY

By Their Attorneys,

ENRIGHT LAW LLC

/s/ Thomas J. Enright
Thomas J. Enright (#664564)
696 Reservoir Avenue
Cranston, RI 02910
(401) 526-2620
tom@enrightlawoffice.com

Oscar M. Price, IV (*pro hac vice forthcoming*)
(oscar@pricearmstrong.com)
Jacob M. Tubbs (*pro hac vice forthcoming*)
(jacob@pricearmstrong.com)
PRICE ARMSTRONG, LLC
2226 1st Avenue South, Suite 105
Birmingham, AL 35203
(205) 208-9588

***Attorneys for Plaintiffs / Relators***

Dated: May 17, 2021